UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| JESSE WAYNE CLARK,<br><br>                    Plaintiff,<br><br>v.<br><br>ICICLE SEAFOODS, INC. *in personam*; F/V ARCTIC STAR, *in rem*, her tackle, gear, furniture, apparel and equipment, ON # 501203,<br><br>                    Defendants. | No.  C06-25Z<br><br>FINDINGS OF FACT AND<br>CONCLUSIONS OF LAW |

THIS MATTER came on for trial beginning on October 1, 2007, before the Court sitting without a jury. Plaintiff was represented by James Beard, of Beard Stacey Trueb & Jacobsen, LLP, and defendant was represented by Kara Heikkila, of Holmes Weddle & Barcott, P.C. At the conclusion of trial, the Court took the matter under advisement. The Court, having considered all of the evidence submitted at trial, the exhibits admitted into evidence, the deposition transcripts of Dr. Martin Mankey, David Snow, James Clark, and Kimberly Lindbergh, and the arguments of counsel, and being fully advised, now enters the following Findings of Fact and Conclusions of Law.

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 1

# I.

# **FINDINGS OF FACT**

1. Plaintiff, Jesse Clark, was at all relevant times a seaman in the service of the processing barge ARCTIC STAR.

2. Defendant, Icicle Seafoods, Inc. ("Icicle Seafoods"), is a corporation organized under the laws of the State of Washington and conducting business in the Western District of Washington.

3. At all relevant times, defendant Icicle Seafoods was the operator of the ARCTIC STAR, which is a 265-foot processing barge with a crew of approximately 150. The ARCTIC STAR processes seafood product delivered to it by catcher vessels.

4. On May 1, 2005, while employed on the ARCTIC STAR, the plaintiff sustained an injury on defendant's processing barge, the ARCTIC STAR. There were no witnesses to the accident. The accident occurred on the third day of plaintiff's work on the ARCTIC STAR.

5. Plaintiff alleges that he sustained the injury while working as a processor, loading and unloading fish product into the blast freezer tunnel of the ARCTIC STAR. That position, in part, requires employees to move carts loaded with trays of freshly processed seafood from an elevator that brings the product from the processing deck to the freezer deck. The carts are moved through the freezer common area or "freezer flat" into freezer tunnels. In the tunnels, which are lined with coil shelving, the trays of freshly processed seafood are then transferred from the carts to the shelves. Crewmembers work in two-person teams in this process, under the direction of a lead crewmember. After the seafood is transferred from the carts to the shelves, a single member of the crew pulls the cart from the freezer area using a chain handle. The chain handle gives the crew member space between the cart and the crew member. When pushed in the freezer tunnel, the carts are engaged on a tracked roller system that suspends the freezer carts above the deck of the freezer tunnel.

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 2

1  The freezer carts weigh approximately 715 pounds when empty.  Approximately four to five

2  feet before the exit of the freezer, there is a sloped ramp.  As the cart travels up this ramp,

3  the distance between the bottom of the cart and the deck of the freezer tunnel decreases.

4       6.      The parties dispute how and where the accident occurred.

5       7.      Within hours of his accident, plaintiff filled out an Employee Injury Report,

6  Exhibit 3, which described what plaintiff was doing at the time of the accident as follows:

> I was pulling out a cart out of the freezer by the chain and just before my exit out of the freezer I looked back to see if it was clear to come out and somehow lost my footing and the cart rolled over my foot.

The same report states that at the time of the accident "I was in the freezer about five feet from the exit door."

8.      Shortly after the accident, defendant's vessel safety manager, Kimberly Lindbergh, investigated plaintiff's accident and prepared a two-page Accident Investigation Report, Exhibit 2, after interviewing plaintiff and his co-workers in the area.  It describes the accident happening as follows:

> Clark and Siligi had finished unloading pans of fresh herring on the shelves of blast freezer #6. Siligi was behind the cart. He stopped pushing and said to Clark, I'm going to check the fish in the pan we just loaded, you got it (meaning the cart). The empty carts weigh 300 pounds and there is a chain in the vertical center of the cart along with the pull bar to allow a person to pull the cart without having the bottom shelf roll against his ankles as he pulls. Clark was pulling with his right hand only, his body perpendicular to the cart with his right side next to the cart, right foot behind him. He was approximately one cart length away from the door to the freezer and was facing the door. His right foot slipped and he went down on his left hip, his right leg across his left. The cart moved forward as he was slow to let go of the chain when he fell. The wheel of the cart rolled over the front of his left foot while it was positioned on its side (inside arch against the floor).

9.      Plaintiff has consistently told his treating doctors that his foot was crushed by the fish cart and that he was pulling on the chain of the cart when he slipped and fell. However, plaintiff could not explain why he fell, nor could he give a reason for the fall during the accident investigation.

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 3

10. At trial, plaintiff testified the accident occurred in the freezer tunnel, "pretty close to the exit door." This testimony is consistent with the report, Exhibit 3, that describes the accident as occurring about 5 feet from the exit door. At trial, plaintiff also testified that ice and frost in the freezer area caused him to fall. Plaintiff testified that "It felt like ice." Prior to trial, plaintiff had only reported in his own handwriting that "somehow I lost my footing" (see Exhibit 3) and had never said he slipped on ice during the investigation.

11. During trial, plaintiff demonstrated how he fell. During this demonstration plaintiff lay on his side with his left foot up in the air. In contrast, during his deposition taken on August 25, 2006, he testified his left foot, which was injured at the time of the accident, was on its side after his fall.

> Q: Was your foot sitting straight up in the air? Was your boot standing straight up in the air?
>
> A: No it was __
>
> Q: Was it to the side and on the ground?
>
> A: Yes.
>
> Q: So it was to the side and on the ground, and the cart rolled over that?
>
> A: I believe so. It happened quickly . . .

Exhibit A-53, Clark Deposition at 65:10-17.

12. Defendant's liability expert and engineer, Vern Goodwin, inspected the barge both in Alaska and in Seattle, and performed comprehensive measurements and testing on the boots, floors, and carts. He testified that the accident could not have happened as plaintiff described in his deposition testimony. Plaintiff testified that his foot was on its side when the cart rolled over it. At the point in the freezer where the plaintiff testified that the accident occurred, the cart is suspended from overhead rails, and there is a clearance of approximately seven inches from the bottom of the cart to the walking surface of the freezer tunnel. A boot on its side measures less than seven inches. Therefore, there was adequate

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 4

clearance and the cart would not have made contact with the boot.  The Court finds that the accident could not have occurred as described by the plaintiff's testimony.

13. At all times material prior to the accident, plaintiff had flat feet and would experience sore feet after long periods of standing or walking.

14. On November 7, 2005, plaintiff was treated at Campbell Orthopaedic Physical Therapy.  The letter report of that date, Exhibit A-36, reports that plaintiff said "he has had a past medical history of chronic severe flat feet deformity for which he is currently wearing non-custom made orthotics."

15. Plaintiff has not always reported facts truthfully.  When plaintiff filled out his employment application, Exhibit A-6, he stated he was a high school graduate.  In fact, plaintiff only finished 9th grade and had, without success, taken the GED exam five or six times.  In the application, plaintiff also lied about prior employment and the duration of his prior employment.  Plaintiff was interviewed prior to employment by defendant.  Plaintiff lied about his work history at the time of the interview.  Plaintiff also filled out a Health Questionnaire in connection with his application for employment.  See Exhibit A-8.  Plaintiff stated he had never had or been treated for foot problems nor had a prior back injury or strain.  These representations were untrue.

16. Plaintiff now denies reports by various doctors who have attempted to report plaintiff's description of the accident.  Doctor Mankey, his primary treating physician, reports plaintiff said he was pushing the cart up a slope at the time of the accident.  (See report dated May 9, 2005, Exhibit A-13).  At trial, plaintiff denied telling Doctor Mankey he was pushing the cart up a slope.  Plaintiff saw Doctor Lance Brigham for an independent medical examination on August 24, 2006, and Doctor Brigham's report dated August 24, 2006, Exhibit A-85, states that plaintiff "was on the flat" and that he does not know how he fell.  At trial, Plaintiff denies telling Doctor Brigham the accident happened on the flat or that he doesn't know how the accident happened.

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 5

17.     Plaintiff has a mainly alcohol-related criminal history that dates back to age 16, when he received his first DUI.  While living in Arizona he received two more DUI's, spending 30 days and 120 days in jail, respectively.  He was convicted of aggravated DUI in Arizona in 2001, and was sentenced to two and one-half years in jail.  He was incarcerated from October of 2002 until April of 2004.  When he entered prison in 2002, plaintiff was 23 years old.

18.     Based on all the evidence, the Court finds that, at the time of the accident, plaintiff was pulling a cart at a walking pace and fell in the freezer tunnel 5-10 feet from the exit door of the freezer tunnel.  Plaintiff did not slip on ice or frost; rather plaintiff merely slipped and fell.  The area where plaintiff fell was on a flat portion of the tunnel.

19.     This accident happened very quickly and the exact position of one's foot at the moment of such an accident would be difficult for anyone to know or describe with precise accuracy.

20.     As a result of his accident, plaintiff suffered a Lisfranc dislocation fracture of his left foot. In addition to the disruption of the ligaments of his foot, he suffered a comminuted fracture of the base of the second metatarsal, a non-displaced fracture through the base of the third metatarsal, a comminuted fracture of the base of the fourth metatarsal with slight displacement, and a minimally displaced fracture of the fifth metatarsal along the inferior base. <u>See</u> Doctor Mankey letter dated May 9, 2005, Exhibit 40. Dr. Martin Mankey, an orthopedic physician specializing in surgery of the feet, was plaintiff's treating physician. Dr. Mankey surgically repaired plaintiff's injuries in an open reduction and internal fixation procedure on May 13, 2005.  This, in part, involved placing four surgical screws across plaintiff's mid-foot joint to stabilize the dislocation and multiple fractures. The surgery is accurately depicted in Exhibit 74.  One screw was subsequently removed from Plaintiff's foot on August 8, 2005, and the other three screws were removed on October 21, 2005. Plaintiff participated in physical therapy following his surgery.

21. Prior to the accident, plaintiff was instructed to use the chain handle to pull the carts from the freezer tunnel. Although the carts weighed 715 pounds empty, they were able to be pulled relatively easily using the tracked roller system that suspended the freezer carts above the deck of the freezer tunnel.

22. Defendant has established training and safety procedures targeted at safe operations, including those in the freezer. The current freezer operation on the ARCTIC STAR has been in place and in almost continual operation for nearly 30 years. Defendant presented the testimony of Steve Lee, a 35-year veteran of the fishing industry, who has been the Vessel Manager on the ARCTIC STAR for ten years. Defendant also presented testimony by deposition of former ARCTIC STAR Safety Manager, Kimberly Lindbergh. Each of these individuals testified regarding the operation, training, and safety procedures in place prior to and on the date of plaintiff's injury. The Court finds that defendant adequately trained and supervised plaintiff with respect to both the operation and safety procedures in the freezer.

23. Plaintiff received onboard safety training, including specific training on his particular job. Plaintiff understood that he was supposed to report any concerns, and testified that he was comfortable with the requirements of the job. Plaintiff understood the requirements for safely working in the freezer, and testified that the carts moved smoothly in the freezer tunnel because they are suspended and ride on rails. Furthermore, plaintiff testified that it was relatively easy for one person to maneuver the empty cart in the freezer tunnel. The Court finds that the operation as trained was safe.

24. The carts on the ARCTIC STAR are equipped with both a fixed handle and a chain handle. The carts are used in the freezer area and on the processing deck. Defendant trains its employees to use the chain handle while pulling the cart out of the freezer tunnel in order to prevent injuries. The chain handle gives the employee additional space between themselves and the cart. Plaintiff's liability expert, Stanley Freeman, testified that a

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 7

proposed hypothetical fixed handle system was a safer alternative to the existing chain handle.  Plaintiff's expert was unable to name a single seafood processor that used a fixed-handle design similar to the hypothetical design.  Additionally, plaintiff's expert performed no tests to determine the feasibility of any proposed design in the freezer or other areas of the processing barge, nor did he consider potential hazards of any proposed design.  Plaintiff's expert could not provide testing or data in support of his theory that the chain system was not safe, that the fixed handle system would have stopped the cart in an accident as described by plaintiff, or that the accident would have been prevented with the use of a hypothetical fixed-handle system.  A proposed alternative that is untested and of questionable feasibility is insufficient to establish that the current cart handle design is unsafe.  The Court finds that the chain handle cart design currently used by defendant is safe and reasonably fit for its intended purpose.

25. Plaintiff contends that it would have been safer to push the freezer carts out of the freezer tunnel rather than pull the carts out of the freezer using the chain handle.  The Court finds that the method used by plaintiff was safe and cannot conclude by a preponderance of the evidence that pushing the carts would have reduced the risk of a slip and fall or otherwise would have prevented plaintiff's accident.

26. Prior to plaintiff's accident, there had been at least one prior similar injury of a seaman involving the freezer carts.  On or about July 8, 2003, Scott Taylor was injured on the BERING STAR, a sister ship to the ARCTIC STAR while pulling a freezer cart out of a similar freezer.  The Accident Report, dated July 8, 2003, Exhibit 48, indicates the accident happened when Taylor was pulling a cart out of a freezer and his foot was run over by the cart.  The Report of Occupational Injury or Illness, Exhibit 49, states that Taylor "slipped bring [sic] it out."  This report was filed with the Alaska State Department of Labor and Workforce Development.  No report was filed with the U.S. Coast Guard.  Scott Taylor's

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 8

written statement, Exhibit 70, in a redacted form, was admitted into evidence. Taylor is now deceased and was unavailable to testify at trial.

27. Prior to the accident, there had been at least two additional accidents involving the freezer carts under circumstances that were <u>not</u> similar to plaintiff's accident in this case. <u>See</u> Exhibits 51 and 53. The Endicott injury involved Endicott pushing a loaded cart into a freezer, and after another crew member caught his heel on the lip of a doorway and slipped, Endicott continued pushing and sustained a broken arm. <u>See</u> Exhibit 51. The Endicott injury did not involve use of a chain system. Jack Apthorp was injured while pulling a full cart into the freezer and holding the door open at same time. <u>See</u> Exhibit 53. Both the Endicott and Apthorp accidents were investigated by defendant and corrective action was noted in the incident report and investigation.

28. Defendant Icicle Seafoods investigated each of the accidents described in Findings of Fact 26 and 27. There was nothing brought to the attention of Icicle Seafoods that would give notice of any unsafe condition on the vessel or relating to its equipment.

29. The Occupational Safety and Health Administration (OSHA) "possesses the statutory authority to regulate the working conditions of seaman aboard uninspected vessels." <u>Montaperto v. Foss Maritime Co.</u>, 2000 WL 33389209 at * 1 (W.D. Wash. 2000) (citing <u>Donovan v. Red Star Marine Servs., Inc.</u>, 739 F.2d 774, 780 (2d Cir. 1984). The ARCTIC STAR is an "uninspected vessel" and the working conditions of the factory/processing areas on the ARCTIC STAR are regulated in part by OSHA. Uninspected vessels are also subject to a number of Coast Guard safety-related regulations. <u>Herman v. Tidewater Pac., Inc.</u>, 160 F.3d 1239, 1242 (9th Cir. 1998). Among those regulations is one requiring the reporting of a marine casualty or accident to the nearest Sector Office, Marine Inspection Office or Coast Guard Group Office. 46 C.F.R. § 4.05-1(a). A marine casualty or accident means one involving a vessel, occurring upon the navigable waters of the United States, and consisting of an injury requiring professional medical treatment and rendering the injured individual

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 9

unfit to perform his or her routine duties. 46 C.F.R. § 4.03-1(a) & (b)(4); 46 C.F.R. § 4.05-1(a)(6).

30. Plaintiff contends that defendant's failure to file Coast Guard accident reports relating to the prior injury accidents aboard their vessels was a violation of 46 C.F.R. 4.05-1. For the reasons stated in Finding of Fact 27, the Endicott and Apthorp accidents were completely unrelated to the type of injury alleged by plaintiff in the present case. Any failure to file a Coast Guard accident report relating to those incidents could not be a basis for a claim of negligence in the present case. However, plaintiff contends specifically that, with respect to Scott Taylor's prior accident, had defendant filed a report with the Coast Guard, it could have resulted in changes to the design and method of moving carts out of the freezer and would have prevented plaintiff's accident.

31. Defendant's vessels and barges operate within three miles of Alaska and are in state waters. The State of Alaska requires the filing of injury reports with the Department of Labor and Workforce Development. Defendant Icicle Seafoods contends that, by filing the report of Taylor's accident with the appropriate department of Alaska, it fully discharged its duties and it was not required to also file the report with the Coast Guard. Historically, Icicle Seafoods has filed accident reports with the Coast Guard only for injuries involving a ship's crew and not for production workers and processors. When defendant has filed such reports with the Coast Guard, the response in most cases has been nonexistent.

32. Coast Guard accident reports are required to enable the Coast Guard to conduct investigations, which are made for the purpose of taking appropriate measures to promote safety of life and property at sea. 46 C.F.R. § 4.07-1(b). Reports of marine accidents are made on U.S. Coast Guard Form 2692, a copy of which is attached to plaintiff's trial brief relating to Coast Guard reports, docket no. 77. USCG Form 2692 calls for an employer to suggest changes that might prevent accidents in the future. Scott Taylor's prior accident occurred under similar circumstances as plaintiff's accident. The Court finds that defendants

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 10

had an obligation to file a report concerning Taylor's injury with the Coast Guard; however, plaintiff has failed to establish any causal connection between the alleged reporting deficiency and his injury. In each prior accident cited by plaintiff, defendant investigated the accident, filed a report with the State of Alaska, and determined the nature and extent of the necessary corrective action to be taken. Nothing occurred in connection with these investigations that would have suggested any change in procedures that would have prevented plaintiff's accident.

33. Plaintiff's slip and fall was not caused by any unsafe chain handle on the freezer cart or the lack of a fixed handle on the freezer cart.

34. The Court finds that the defendant was not negligent and the vessel was not unseaworthy.

## II.

## **CONCLUSIONS OF LAW**

1. The Court has jurisdiction over this case based upon the Jones Act, 46 U.S.C. § 30104, the general maritime law, and 28 U.S.C. § 1333.

2. The Jones Act provides a cause of action in negligence for seaman injured in the course of employment. To prove negligence under the Jones Act, plaintiff must show duty, breach, notice, and causation. Ribitzki v. Canmar Reading & Bates, Ltd., 111 F.3d 658, 662 (9th Cir. 1997). The mere fact that a seaman suffers an injury does not create liability; rather, the seaman must prove the existence of negligence on the part of his employer. To recover, the seaman must prove that his employer's negligence played "any part, even the slightest, in producing his injury." Ribitzki, 111 F.3d at 664 (quoting Lies v. Farrell Lines, Inc., 641 F.2d 765, 771 (9th Cir. 1981)); see also Rogers v. Missouri Pac. R. Co., 352 U.S. 500, 506 (1957). Plaintiff has failed to meet his burden to establish that his injury was caused by any negligence on the part of his employer. Plaintiff has failed to establish how this accident occurred and how, if at all, the cart played a role in this accident.

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 11

Plaintiff has failed to establish that the chain handle system was unsafe or that a fixed handle system would have prevented his accident as alleged. Plaintiff has also failed to prove by a preponderance of the evidence that the defendant failed to properly train its crew or assign the proper number of crewmen to move the carts out of the freezer tunnel.

3. Plaintiff alleges negligence as a matter of law based on violation of a safety regulation. Although noncompliance with a safety regulation can establish negligence per se, see Kernan v. Am. Dredging Co., 355 U.S. 426 (1958); MacDonald v. Kahikolu Ltd., 442 F.3d 1199 (9th Cir. 2006), a Jones Act plaintiff must still prove that the alleged violation was a cause in fact of the injury. See Stark v. Totem Ocean Trailer Express, Inc., 2007 WL 201059 at *2 (W.D. Wash.); see also Kernan, 355 U.S. at 433 (violation of a statute creates liability "if the resulting defect or insufficiency in equipment contributes in fact to the death or injury in suit"). Although plaintiff has established by a preponderance of the evidence that defendant was obligated, but failed, to file Coast Guard accident reports, see Herman v. Tidewater Pac., Inc., 160 F.3d 1239 (9th Cir. 1998), the Court concludes that the failure to file Coast Guard reports, including one concerning the Taylor accident, was not a contributing cause of plaintiff's injuries.

4. Plaintiff also alleges that, under the Pennsylvania rule, he is entitled to shift the burden of proof with respect to causation to defendants. The Court, however, concludes that the Pennsylvania rule does not apply in this case. The Pennsylvania rule states that when:

> a ship at the time of a collision is in actual violation of a statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster. In such a case, the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been.

The Pennsylvania, 86 U.S. (19 Wall.) 125, 136 (1873). The Ninth Circuit applies the Pennsylvania rule strictly. Stark, 2007 WL 201059 at *3 & n.1 (citing Waterman Steamship Corp. v. Gay Cottons, 414 F.2d 724 (9th Cir. 1969)). The Ninth Circuit cases applying the rule do so in the context of a collision, and not with regard to Jones Act claims. Before the

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 12

Pennsylvania rule may be used, a nexus must be demonstrated between the injury and the purpose of the regulation that was violated. Stark, 2007 WL 201059 at *3; see also Wills v. Amerada Hess Corp., 379 F.3d 32, 41-45 (2d Cir. 2004). Here, the Court concludes that the purpose of the accident-reporting regulation does not have a nexus to plaintiff's injury. Even if defendants had filed a report with the Coast Guard, no investigation by the Coast Guard was likely to occur, and no corrective actions other than those taken by defendants would have been implemented. Thus, the Court is not persuaded that the burden-shifting Pennsylvania rule applies in this case. See Wills, 379 F.3d at 44 ("The Pennsylvania Rule does not apply where proof that the legal obligation was breached does not lead 'naturally and logically' to the conclusion that the breach caused the injury."). Consequently, the burden of proving causation remains with plaintiff, see Stark 2007 WL 201059 at *3, and plaintiff has not met his burden.

     5.     Plaintiff's complaint for Jones Act negligence is dismissed with prejudice.

     6.     "A shipowner has an absolute duty to furnish a seaworthy ship." Ribitzki, 111 F.3d at 664. To be seaworthy, a vessel must be "reasonably fit for its intended use." Id. To prove unseaworthiness, the plaintiff must prove the following: "(1) the warranty of seaworthiness extended to him and his duties; (2) his injury was caused by a piece of the ship's equipment or an appurtenant appliance; (3) the equipment used was not reasonably fit for its intended use; and (4) the unseaworthy condition proximately caused his injuries." Id. at 664. To show causation, the plaintiff must prove "that the unseaworthy condition was a substantial factor in causing the injury." Id. at 665 (emphasis added). The plaintiff has failed to establish by a preponderance of the evidence how the accident occurred. Plaintiff has failed to establish that the system of moving an empty cart, which the plaintiff himself reported he could carry out easily, was a substantial factor in his injury. Additionally, plaintiff has failed to establish that the chain handle system on the carts was unsafe or that an

alternative fixed handle system would have prevented his injury.  Therefore, plaintiff has not met his burden for proving his unseaworthiness claim.

      7.      Plaintiff's complaint for unseaworthiness is dismissed with prejudice.

      8.      Plaintiff has failed to establish by a preponderance of the evidence that defendant failed to provide plaintiff a safe place to work.

      9.      Defendant has paid plaintiff all maritime benefits to which he is currently entitled.  Based on the testimony of Drs. Brigham and Mankey, plaintiff reached maximum medical improvement in December 2005.  To the extent that plaintiff may require future medical treatment to his foot, maintenance or cure will be allowed.

      10.     Defendant is entitled to judgment dismissing plaintiff's complaint with prejudice and taxable costs.

DATED this 13th day of November, 2007.

                                      /s/ Thomas S. Zilly
                                      Thomas S. Zilly
                                      United States District Judge

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 14